Good morning, Your Honors. My name is R. Wayne McMillan. I represent the petitioner Thu Sor Win, a native and citizen of Burma. She claims a fear of persecution if she returned to Burma, based upon her political opinion, and she bases her fear on past persecution. A number of things occurred to her there, but the primary thing was that she was a victim of a kidnapping, along with others, and a gang rape by members that she believes are members of the USDA, while she and other young people were traveling to a political speech to be given by Daw Aung Suu Kyi, the democracy leader in Burma. Well, I think the first thing maybe you ought to address, or maybe you're just caving on that argument, is that the IJ didn't believe anything she said. As this IJ is wont to do, Your Honor. Well, as you know, it's an adverse credibility determination, and there were two of them. The first was the date, and the next one was the inconsistent testimony regarding the money in the bank. Well, as to the date, Your Honor, the Well, even as to that the police were watching her, and yet she was able to get the passport and the authorization to travel. Okay, as to the date, the respondent in the first statement submitted with her asylum application stated that the date was July 2004, but went on to say that the event that was going on was Aung San Suu Kyi's speech in Maniwa, 40 miles from Burma. Then she changed the date in a new statement to May the 30th, 2003, and testified to that unchallenged. Now, the events of May 30th, 2003 are factual events. They did occur. But if she gave two different dates and the IJ says, hey, I can't believe what you're saying because you gave me two different dates, how am I supposed to go around that on substantial evidence? Well, the IJ did not bring that up until the IJ was giving her decision. Both the IJ and the trial attorney cross-examined Ms. Nguyen, and neither of them asked her about the inconsistency of the dates. So she wasn't confronted? She was not confronted with it. Not given an opportunity to explain? Yes, Your Honor, as we argued in our brief. All right. So let's move then to the allegedly inconsistent testimony about the police watching her. Oh, about the passport, Your Honor. Right. She testified that she obtained a passport by use of a broker. She paid the broker money, which was to be used as a bribe. In the country condition reports, all country condition reports for the last 20 years in Burma, indicate that it's difficult for the average citizen to get a passport and that the use of brokers and bribes is commonplace. And she, in fact, did do that. Did the IJ ever address her reasonable explanation? Never mentioned a word about the broker. But in her decision, and only at her decision, speculated that the government of Burma for some reason would deny this very low-ranking political dissident a passport. An equal argument could be made that they would be happy to get her a passport, let her have a passport, and leave the country. There was a great deal of speculation in the IJ's reasoning as to whether or not the Burmese government would give this young woman a passport, or whether they even knew she existed, for that matter, other than the events that occurred in Mandalay. Now, I also, I mean, I'll be honest. When I read what the BIA said, I wasn't really clear, and what the IJ said, I guess. I wasn't really clear whether the inconsistencies in the bank accounts was really a subject of the determination. It was a little bit unclear to me. Well, the respondent brought a bank statement to demonstrate her address in the United States. I wish she had brought something else, a cable bill or something. But instead, she brought a bank statement that showed four accounts in the Bank of America. The IJ was focused on that and wanted to know where the money came from. The respondent at one point testified that some of it was given to her by her mother to go to school. Other amounts were given by local Burmese in a self-help transfer back to Burma. You can't go down to the American Express company and trade your dollars for check here in the United States. You have to engage in these types of self-help exchanges. I think you put money in a bank here and somebody calls over in Burma and says put money in a bank over there. So that was her brief explanation. So in your mind, is the record clear that the IJ indicated he wasn't going to rely on her testimony on this ground? Not entirely clear. When the IJ addressed credibility, she said there were two reasons. The first reason clearly was the passport reason. Then she mentioned the change in date but didn't say she was making an adverse credibility finding on the change of date. Then she discussed the money in the bank and did say she was making, I believe she said she was making an adverse credibility finding. Well, she said not a significant issue. Well, she did say that. But then ten minutes later in her oral decision, she brought that up as one of the reasons not to believe the respondent. I see. And we did. Well, then she did make an alternative finding, right? I guess she did. Just before the decision, actually during the decision, there was back and forth between whether the IJ. Was she back then or was it only the BIA who made an alternative finding? I was not quite clear as to which of the three findings the judge was relying on to deny credibility. The BIA sort of backstopped the IJ. Well, then the BIA, as I read it, says we make an alternative finding here. She's credible. Wynne is credible, but denied relief because Wynne failed to establish she was persecuted on account of a protected ground. Yes, Your Honor. Thank you. On the nexus issue, the IJ simply found that this was a band of criminals who had done the kidnapping and the rape. In the course of our argument to the BIA, we pointed out the country condition reports did point out that there was such a group as the USDA. It was shown in the country condition reports on that exact same day, May 30th, 2003. That same group of people, not those particular people, but the USDA, attacked the Aung San Suu Kyi convoy and 70 people were killed, 30 some odd were missing. So the BIA acknowledged that, well, these people were perhaps more than just common criminals, but that the respondent had changed her date to coincide with the attack on Aung San Suu Kyi. Well, but you can't really go with that if you're going to make an alternative finding. Because if they make an alternative finding, then your client is credible, correct? Yes. So at that point that she's credible, if you accept her testimony as credible, she testified that men raped her were part of a military supported organization. Yes. And she testified to a causal connection between her support of, and I'm not going to say this right, Aung San Suu Kyi. That's close enough. And her rape. Yes. That's what she said. Yes. Okay. Well, if I could have a moment, Your Honor. You can have all the moments you want. You're just running out of time. I have a moment and 12 seconds. The group that attacked the bus that was carrying Ms. Nguyen and her friends, they came in what appeared to be military trucks. They were carrying sharpened sticks, which was the same instruments carried by the group attacking Aung San Suu Kyi. They separated the women. They took them to an abandoned factory. They took their identifications and asked them if they went to school. They asked them what the purpose of their trip was. And when Ms. Nguyen replied to go to a speech by Ms. Aung San Suu Kyi, one of them said, this is what happens to people who support Aung San Suu Kyi. And then she was raped by an individual and two others. Counsel, it's Judge Gould. It's Judge Gould. You only have a half minute left. I thought you wanted to save a little time for rebuttal. I will. And we are familiar with the record. Thank you. Thank you very much. Thank you, Judge Gould. All right, Counselor. You've kind of heard the general outline, so you know what you've got to talk about. Good morning, Your Honors. Aaron Petty on behalf of the Attorney General. May it please the Court. The Board gave four independent bases for concluding that the petitioner in this case lacked credibility, any one of which would be sufficient to sustain the Board's decision under the substantial evidence standard. And I'd like to focus on the first two of those, the materially inconsistent dates and the provenance of large sums of money in her bank account. Okay. First, in her first statement, she said that she was raped in July of 2004 at a place called Man Iwa. Then in her second statement, she said she was raped May 30, 2003, 14 months previously. But whenever we have these problems, what's the first thing you look at? Or at least I did. I didn't know much about immigration until I came here. What's the first thing, even if an inconsistency, what's the first question one should ask oneself? Was she confronted? Yes, she was, Your Honor. Where was she confronted? Page 83, Your Honor. She had an opportunity to explain. She said, I thought the date was already corrected, but she never explained why it was wrong to begin with since she typed out that first statement herself. Well, I guess I wondered why she was not asked why there were two different versions of her statement or why the date for the incident was corrected or changed. She was only asked why she stated in her application why the date she stated was correct. That was it. And she said that she thought it was already corrected, but she had an opportunity to explain why it was wrong in the first one, and she never provided any information on that. She typed out that statement herself. This is not a situation where there's a notario or an attorney that's writing it for her. She typed that out herself. She gave a long date by 14 months, and it's a material date. Well, I guess I looked at Guo versus Ashcroft. Our court held unclear testimony may not serve as substantial evidence for an adverse credibility finding when the applicant is not given the chance to attempt to clarify the statement. And that's in my book. She was not asked why there were two different versions of her statement, and she was not asked why the date was corrected or changed. She was asked. She said it was because she thought it was already corrected. That's why she had to change it right after she swore to its correctness. All right. I understand your argument. Let's move to the next. Well, in addition, in her testimony, it's only in her testimony that she said she was raped at Depayin. In both of her statements, she says it was at Maniwa. So she's gone from July 04 in Maniwa to May 30, 2003 in Depayin to line it up with a known event. I understood your argument. With respect to the Providence Hotel. Yeah, how far apart are those two locations? It's not in the record, Your Honor, but they're about 45 miles apart. But it's not in the record? It's not in the record. With regard to the money, you have to go back to page 77 to understand why her bank accounts are relevant here. The immigration judge was concerned that she was either working without work authorization or how she was able to obtain a Social Security card because she had just explained that she lost her passport. And the immigration judge didn't know how she could obtain a Social Security card if she had no identification. So the immigration judge, I said, I'd love to see some bank accounts. She brings bank accounts in. Was there any inquiry to determine whether that Social Security card was a legitimate one? Not that I'm aware of, Your Honor. There's nothing in the record to indicate that it was an illegitimate one. That's correct. But if she was able to obtain one at all, she must have presented something, assuming that it was a valid card. So we're talking about the inconsistencies with the bank accounts? Yes, Your Honor. So where do I read in the record that the IJ found this reason alone would be a basis for the adverse credibility determination? The immigration judge said. I thought the IJ said it was not a significant issue. The immigration judge said, well, it may not go to the heart of the claim. And remember, this is 2008, so this is very soon after the Real ID Act came out. Well, I understand. Not a significant issue. While it may not go to the heart of the claim, it does cast doubt on the respondent's credibility. And so that means the IJ said this is my basis for my decision? It was what the IJ says it was. That's the best I got, isn't it? It's what the IJ says it was. It cast doubt on her credibility. The board treated it as a finding, and that's sufficient. She said at page 143 that this was money for her educational expenses. Then she said it was money to transfer to Burma. And then at page 145, she throws her hands up and says, I know nothing about this money. But it is relevant, even though it's not directly relevant to her claim, because ultimately it goes to how she was able to obtain a Social Security card and ultimately to her identity. Does the IJ mention the concern about the Social Security card? You can infer it from the immigration judge's discussion. He is concerned about whether she's working without work authorization, and he does say, I wonder how she got a Social Security card. But this was not simply, oh, I'd like to see bank accounts instead of phone records. This was a specific problem that the immigration judge addressed. The problem, I think, is articulated by Judge Corman's question, coupled by mine, when he says this isn't a really significant issue, but it casts doubt. Usually when I read an IJ's opinion, they've nailed down, these are the reasons I find the credibility determination. It seemed to me it was far more easy for me to determine that the IJ was going to do it based on the date of the alleged rape or on the inconsistency about the police were watching her, and yet she was able to get the passport and the authorization to travel. Well, Your Honor, I agree that both of those are clearly findings by the immigration judge, both clearly affirmed by the board. The provenance of the $15,000, I think the immigration judge is just acknowledging that the Real ID Act, pre-Real ID Act standard, no longer applies, and it doesn't have to go to the heart of the claim. Well, and the reason I'm worried, because if I look at the claim where the police were watching, yet she was able to get a passport, I don't know that the IJ even addressed her reasonable explanation about the inconsistency. Well, it's not an inconsistency with regard to the ability to get the passport and leave, so much as an implausibility, because she said she was being monitored by the government, she says all kinds of horrible things happened to her, she was denied her pharmacy license, her brother was expelled, and those are inconsistent with other evidence of record, not with other testimony. Well, but the IJ even failed to address the explanation, which was, my family paid a bribe. There is an explanation. What's the explanation by the IJ for that? No, no, no, she gave an explanation, but that doesn't obviate the inconsistency with other evidence of record. I'm not talking about obviating, I'm saying, first thing, I've got to find an inconsistency, the next thing, you've got to have a confrontation, the next thing, the IJ has to explain why he doesn't believe what she said about the confrontation. Well, I got the inconsistency, I got what she said about it, and I got nothing about why the IJ didn't believe it, nothing. I'm just going through what I generally do in these circumstances, based on our case law. I think it's important to remember this is a post-Real ID Act case, and so the case law that applies is going to be the case law that's addressing the evidence. Well, this is not post-ID case law. This is case law we've had in this circuit for a long time. You confront the witness about the inconsistency. If you don't confront, you can't get there. Then you ask for an explanation, and then you say why you don't believe it. That's been here since I've been here, which I was way before this. I guess I'm trying to – you're not suggesting that's wrong, are you? I'm suggesting that the Real ID Act may have changed the burden for that, and I think that has been addressed in some of the case law. You got a good case for that? No, Your Honor. Okay. And the fourth finding here was the presence of soldiers. At 108-09, she says that she was attacked by a crowd of people dressed in civilian clothes, and in her written statements at 162-63 and 276, she says they were soldiers. And so all four of these issues, when you take them in context of her lost or stolen passport that wasn't actually lost or stolen, the issue about her bicycle, and the fact that she was testifying for notes at the beginning of her testimony, it gives you a good feeling for why the immigration judge found her incredible. And for all these reasons, we'd ask that you would deny the petition for review. Thank you. Counselor, without having Judge Gould tell me again like he has every other day that we've been here together, you get another 30 seconds, you get another 30 seconds. The Real ID Act, Your Honor, should not be used as an excuse to deny perfectly good asylum cases. Second point as to Nexus, when Ms. Wynn attempted to report this to the police, she was rebuffed. She was threatened to be jailed if she continued with her efforts to report. And then a few days later, they came to her house and threatened her again. Now, if these were just criminals out kidnapping and raping, why would the police take up their side and threaten her after she identified them as being members of the USDA? The very difficult thing for people to testify in asylum cases using interpreters, minor inconsistencies should not be coupled with the Real ID Act to try to deny a perfectly good case where a person has suffered severe persecution in Burma. In this case, Your Honor, the court should remand it. Thank you for your argument. Case 11-72026, Wynn v. Holder is submitted, and we'll move to Case 13-50331, USA v. Daniels.
judges: Korman, GOULD, SMITH